IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| JULIE STEWART, M.D., | ) CIVIL ACTION NO. __ <br> ) <br> ) <br> ) <br> ) <br> ) **COMPLAINT** <br> ) (Jury Trial Demanded) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| Plaintiff, | |
| vs. | |
| DENNIS SCHIMPF, PC; SWEETGRASS PLASTIC SURGERY, LLC; GVO SWEETGRASS, LLC; GVO HOLDINGS GROUP, LLC; GVO PARTNERS; CRAIG BLUM, PC; DENNIS SCHIMPF, M.D.; and JOSEPH SCIAMANNA, | |
| Defendants. | |

## INTRODUCTION

1. Plaintiff, Julie Stewart, M.D., brings this action pursuant to the Americans with Disabilities Act, ("ADA"), 42 U.S.C. §12101, *et seq.*, to remedy discrimination taken against her by the Defendants on account of her disabilities—which include breast cancer, debilitating, extensive surgeries, continuing multiple chemotherapies, anxiety, sleep disturbances, and other sequelae—and retaliation for her related protected activity.

## PARTIES

2. The Plaintiff, Julie Stewart, M.D., is a citizen and resident of Charleston County, South Carolina. She is an ophthalmologic surgeon. At all relevant times, she has suffered from disabilities which limit major life activities. Those disabilities include her cancer which, among other things, limits the major life activity of normal cell growth, debilitating, extensive surgeries, and continuing multiple chemotherapies, anxieties, sleep disturbances, and other sequelae. Each of these limit major life activities. Her disabilities are expected to continue to substantially limit

1

her major life activities so as to afford her protection from discrimination and retaliation under the American with Disabilities Act (ADA) and its implementing regulations. However, at all times pertinent, she was able to perform all the essential duties of her employment with, or without, reasonable accommodation.

3.      Defendant Dennis Schimpf, P.C., is a South Carolina professional corporation, whose sole shareholder is Defendant Dennis Schimpf, M.D. ("Dr. Schimpf"), a citizen and resident of Charleston County, South Carolina. Defendant Dennis Schimpf, P.C. is an "employer" within the meaning of the ADA and employed Plaintiff in Charleston County, South Carolina.

4.      Defendant Sweetgrass Plastic Surgery, LLC ("Sweetgrass") is a South Carolina limited liability company, whose sole member is Dr. Schimpf, a citizen and resident of Charleston County, South Carolina. Defendant Sweetgrass is an "employer" within the meaning of the ADA and employed Plaintiff in Charleston County, South Carolina.

5.      Defendant GVO Sweetgrass, LLC ("GVO Sweetgrass"), is an entity organized and existing under the laws of the State of Delaware and conducts business in many jurisdictions, including Charleston County, South Carolina, where it conducts substantial business. Upon information and belief, GVO Sweetgrass has two members: (1) Sweetgrass, a South Carolina limited liability company, whose sole member, Dr. Schimpf, is a resident of Charleston County, South Carolina, and (2) GVO Holdings Group, LLC, a Delaware limited liability company. Defendant GVO Sweetgrass is an "employer" within the meaning of the ADA and employed Plaintiff in Charleston County, South Carolina.

6.      Upon information and belief, Defendant GVO Holdings Group, LLC ("GVO Holdings") is an entity organized and existing under the laws of the State of Delaware and conducts business in many jurisdictions, including substantial business in Charleston County, South

Carolina. Upon information and belief, GVO Holdings has at least two members, Defendant Joseph Sciamanna ("Sciamanna"), who is a citizen and resident of Charleston County, South Carolina, and another member, a citizen and resident of Hong Kong, China. GVO Holdings is an "employer" within the meaning of the ADA and employed Plaintiff in Charleston County, South Carolina.

7.   Defendant GVO Partners is a business entity, corporate form uncertain, and perhaps a d/b/a, that is, upon information and belief organized and existing under the laws of a state other than South Carolina, with its principal place of business in a state other than South Carolina, and conducts business in many jurisdictions, including substantial business in Charleston County, South Carolina. Defendant GVO Partners is an "employer" within the meaning of the ADA and employed Plaintiff in Charleston County, South Carolina.

8.   Defendant Craig Blum, P.C., is a South Carolina professional corporation, whose sole shareholder is, upon information and belief, Craig Blum, M.D.  Defendant Craig Blum, P.C., is an "employer" within the meaning of the ADA and employed Plaintiff in Charleston County, South Carolina.

9.   Defendant Dennis Schimpf, M.D., is a citizen and resident of Charleston County, South Carolina. At all times relevant, he was an "employer" within the meaning of the ADA and employed Plaintiff in Charleston County, South Carolina. Dr. Schimpf is named as a defendant because the status of the corporate shield for the corporate defendants is not clear, and he may be individually liable for the corporate acts.

10.   Defendant Joseph Sciamanna is, upon information and belief, a citizen and resident of Charleston County, South Carolina. At all times relevant, he was an "employer" within the meaning of the ADA and employed Plaintiff in Charleston County, South Carolina. Mr. Sciamanna

is named as a defendant because the status of the corporate shield for the corporate defendants is not clear, and he may be individually liable for the corporate acts.

11. All of the above-listed Defendants are a "joint employer" for purposes of the ADA and jointly employed the Plaintiff in Charleston County, South Carolina.

## JURISDICTION, VENUE, AND TRIAL BY JURY

12. This action arises under the laws of the United States, specifically the ADA, and accordingly, this Court has jurisdiction pursuant to 28 U.S.C. §1331. Venue is proper in this Court pursuant to 28 U.S.C. §1391, as a substantial part of the events or omissions giving rise to the claims occurred in this judicial district. The Plaintiff requests a trial by jury of all issues which may be submitted to a jury.

## CONDITIONS PRECEDENT

13. The Plaintiff timely filed administrative charges with the Equal Employment Opportunity Commission (EEOC). (Charge Nos. 832-2025-00173 – 00176).

14. The EEOC issued a "Notice of Right to Sue" dated December 18, 2025, for each of the above-referenced charges. Those documents are attached hereto as Exhibit A. This lawsuit is timely filed.

## STATEMENT OF FACTS

15. Plaintiff is a 54-year-old female ophthalmologic surgeon who was diagnosed with breast cancer in 2023. During all times relevant to this action, she has suffered from disabilities which limit major life activities.

16. Plaintiff's disabilities include her breast cancer which, among other things, limits the major life activity of normal cell growth, debilitating, extensive surgeries, and continuing multiple chemotherapies, anxieties, sleep disturbances, and other sequelae. Each of these limits

major life activities. Plaintiff's disabilities are expected to continue to substantially limit her major life activities so as to afford her protection from discrimination and retaliation under the American with Disabilities Act (ADA) and its implementing regulations. The chemotherapy she has endured has left her with enough peripheral neuropathy, particularly in her feet, which eliminates her ability to continue to perform the most common ophthalmic surgeries, cataract surgery (both feet operate a pedal during surgery).

17.     However, at all times pertinent, she was able to perform all the essential duties of her employment with, or without, reasonable accommodation.

18.     Plaintiff is an individual with a disability – a person who has a physical or mental impairment that substantially limits one or more major life activities, a person who has a history or record of such an impairment, and a person who is perceived by others as having such an impairment.

19.     Beginning in late October/November 1, 2024, Plaintiff became employed by the above-designated joint employers, the Defendants in this action.

20.     Defendant Dennis Schimpf, M.D., a plastic surgeon, is one of their principals—or was during the time relevant to this lawsuit.

21.     Another principal is Defendant Joseph Sciamanna, who developed some sort of eye drug for dogs, and who used the proceeds of its sales to establish an investment/operating company, GVO Partners, which may be a d/b/a for one or more of his other entities, including GVO Sweetgrass and GVO Holdings. Mr. Sciamanna is not a physician and has no medical training. He is, upon information and belief, a private equity investor who, through GVO Partners and various related entities, *inter alia*, purchases controlling shares of medical practices and operates them primarily to maximize their profits.

22. The Defendants are a "joint employer" for purposes of the ADA and jointly employed Plaintiff.

23. Insofar as relevant, they provide plastic surgery and other aesthetic services.

24. In the summer of 2024, Plaintiff reached out to Dr. Schimpf, explaining her condition and inquiring if they would want to add her as a surgeon to conduct upper and lower blepharoplasty (a surgery she has performed for 11 years and remains perfectly capable of performing) along with providing injectables such as botox and fillers.

25. Within a few days, Dr. Schimpf let Plaintiff know they would like to add her as an additional surgeon.

26. Weeks after their initial conversation, Dr. Schimpf texted Plaintiff to ask her thoughts about Hormone Replacement Therapy ("HRT") being offered in the practice. Plaintiff stated that she thought it would be a good fit when evaluating other services provided.

27. Plaintiff's employment was pre-arranged by an employment letter/agreement dated July 8, 2024, but her employment did not actually begin until November 1, 2024. She was to be paid a base salary of $170,000 and provided a commission plan. She was to be provided 401k, health, dental, vision and life insurance. A copy of Plaintiff's executed employment letter/agreement is attached as Exhibit B.

28. As shown by the letter, Plaintiff was to provide 3 types of services: lnjectables, Blepharoplasty, and Hormone Replacement Therapy ("HRT"). The greatest part of her projected commission income was projected to come from injectables and blepharoplasty.

29. When Plaintiff began her employment, she noted and brought to Defendants' attention that she had no patients on her schedule for blepharoplasty consultations or for injectables. She actually only had about 3 patients per week on her schedule prior to her starting.

6

30. In early December, Plaintiff was directed to do only HRT, to the exclusion of her other work.

31. Prior to Plaintiff's employment, there had been no preparation for adding HRT to the practice. There had been no advertising, no prepping of staff that HRT would now be offered, the practice had not partnered with a capable pharmacy—literally nothing had been done.

32. From Plaintiff's first day of employment, it was clear that the staff had no idea who she was or what she would be doing.

33. During her time with the practice, Plaintiff emailed all staff several times explaining what patients should be referred for HRT. Plaintiff provided HRT content to the practice's social media marketing employee to advertise multiple times, but her content was not used. She tried to have lunches with staff to again explain who should be referred for HRT. She sat in on Dr. Schimpf and Dr. Blum's clinics, pointing out and seeing appropriate patients for HRT.

34. Before Plaintiff began work, the parties extensively discussed her doing surgeries and injectables. Hormone Replacement Therapy was added later and described as a small component of her job. However, as previously stated, in December 2024, Plaintiff was directed to focus *only* on HRT, rather than the services for which she had been primarily hired.

35. A partial excuse for this change was Defendants' claim that because Plaintiff was still undergoing chemotherapy, there may be some malpractice problems with her performing surgeries. On another occasion, Plaintiff was told that malpractice insurance would be too expensive if she performed surgeries. Upon information and belief, neither of these statements were true, and no supportive information was ever provided.

36. Plaintiff was (and is) perfectly capable of performing blepharoplasties—the surgeries which she was hired to perform.

37. Several weeks after Plaintiff began her employment, the practice shocked her by telling her that she would be required to pay for her own malpractice insurance. Dr. Schimpf explained that there had been an incident the prior week with Dr. Blum (another physician in the practice) and a prior suit brought against him. Dr. Schimpf stated he believed Plaintiff was just caught in the "crossfire"; he would speak to Joe Sciamanna about it. Whether or not he did, in fact, speak to Sciamanna about it was never made known to Plaintiff.

38. Plaintiff then spoke to Sciamanna herself, who stated that if her numbers were better, Defendants would pay for her malpractice insurance. Plaintiff explained that nothing had been in place prior to her arrival, and it would not be possible yet, at that point, for her numbers to be better. After further explaining about the total lack of advertising, the failure to prep any employees, Sciamanna texted Plaintiff "should we furlough you?" Plaintiff responded that he was scaring her. She was single and undergoing cancer treatment. She was doing everything she could to make the HRT program a success, but it was not supposed to be her only (or even a significant portion of her) job—she was basically starting from scratch to make the HRT program work. At a later date when she brought up the "should we furlough you" comment, Sciamanna replied "oh I was just having a bad day."

39. In December, Schimpf and Sciamanna stated they needed to go over goals with each employee for the upcoming months. They proposed a completely unrealistic quota for the receivables Plaintiff was to generate in January 2025. Defendants were not giving Plaintiff any surgery or injectables patients, so her receivables necessarily had to be based *entirely* on the brand new HRT program.

40. At that time, Defendants had still failed to make available to Plaintiff the correct medications she needed to prescribe to HRT patients. Defendants structured HRT treatment as a

8

monthly membership, so medications needed to be prescribed through a pharmacy with which they had a contractual arrangement. Plaintiff had done extensive research on HRT treatment and care prior to the start of her employment. On multiple occasions, Plaintiff had provided Defendants the list of medications she would need through a partner pharmacy to provide proper medical care. She had explained she needed to be able to prescribe HRT patients these medications, including specific pellets, injectables, patches, etc. However, Defendants had still not even partnered with a pharmacy who could provide the requisite medications.

41.     Nevertheless, Defendants' "expectation" was that Plaintiff would bring in $25,000.00 in the month of January 2025 (she had brought in roughly $4,000.00 in December). Plaintiff reminded both Schimpf and Sciamanna that this would be impossible in January, considering they had still not partnered with a pharmacy—so she had nowhere to prescribe the correct medications—and still no advertising had been done.

42.     In response, Sciamanna recommended that Plaintiff start an Instagram account for this service with the practice. She explained to both Schimpf and Sciamanna that she was a physician/surgeon and not in marketing. She had sent extensive content to their social media employee, whose job was to provide social media marketing, and it had still not been utilized.

43.     Both Schimpf and Sciamanna agreed that the quota was unrealistic and specifically agreed that Plaintiff's employment was not being conditioned on her meeting the quota. Schimpf described the set goal as a "formality," stating he was aware it would not be possible to meet.

44.     In mid-January 2025, Plaintiff had to undergo another extensive surgery related to her breast cancer. Following the surgery, she had to stay home for a few days to recuperate.

45.     Approximately three days after this additional extensive surgery, while Plaintiff was still at home recovering, Joseph Sciamanna called Plaintiff and summarily terminated her

employment over the phone. Plaintiff still had drainage tubes connected and other signs and symptoms of her recent surgery. This was also three days prior to Plaintiff's next chemotherapy treatment.

46. Sciamanna claimed in an email and on the phone that Plaintiff was let go because she did not meet the $25,000.00 goal in January—something he had specifically stated was not a condition for her continued employment.

47. Upon information and belief, Defendants, particularly Sciamanna, did not initially fully understand Plaintiff's disabilities and the treatments she required. After Plaintiff's start date, when they realized the nature and severity of Plaintiff's disabilities—Plaintiff had continuing surgeries, which required post-surgery care including drainage tubes, etc., and ongoing chemotherapy—they began to question her employment and take action against her, on account of those disabilities. Plaintiff remained fully capable of performing all aspects of her job, either with or without reasonable accommodation. Nevertheless, Defendants' discriminatory actions continued. They became increasingly uncomfortable with Plaintiff and continued to discriminate against her on account of her disabilities, which ultimately culminated in her discriminatory termination, almost immediately following an extensive surgery related to her breast cancer.

48. No later than four days after Plaintiff's termination, the practice advertised a position for Aesthetic Nurse Injector (a position to provide injectables like botox and fillers) with a posted salary in the exact range of Plaintiff's salary—a position Plaintiff could have easily done and which was a part of the services she was supposed to provide in accordance with her initial hire letter.

49. The reasons provided for Plaintiff's termination were entirely pretextual, and Plaintiff was in fact terminated unlawfully on account of her disabilities in violation of the ADA.

50. After Plaintiff's termination, her counsel wrote Defendants, advising that her discriminatory termination violated the ADA. In response, a lawyer for the Defendants wrote a letter which – for the first time – claimed that Plaintiff had failed to meet the applicable standards of care, and intimated that she might be reported to the medical board. Defendants also threatened to enforce an unlawful non-competition agreement. These claims are entirely fabricated, and the threats are unlawful retaliation for Plaintiff's protected conduct under the ADA.

51. In addition to the obvious economic consequences—e.g., lost wages, front pay, back pay—the Defendants' foregoing acts and their related consequences have caused Plaintiff to suffer substantial and unwarranted stress and profound emotional distress. According to Plaintiff's oncologist—and as a physician Plaintiff knows—stress increases the likelihood that Plaintiff's breast cancer will return, a fear that is paralyzing to her. In the midst of trying to figure out what to do for employment and finishing her treatment and surgeries, Plaintiff has been in a constant state of anxiety. That anxiety has been exponentially increased by the additional concern that she must figure out a way to manage her stress or otherwise risk the heightened probability of a relapse. Further, since her termination, Plaintiff has had to pay out of pocket monthly for COBRA to continue her health insurance—a much higher amount than she would be paying as an employee. In January 2026, while Plaintiff was at her oncology appointment, she was abruptly informed that her health insurance was not active. Upon investigating, she discovered that the Defendants had unilaterally terminated their contract with ADP, the company providing Plaintiff's COBRA. Defendants provided Plaintiff no notice or warning *whatsoever* that her health insurance would be cancelled. All of this was phenomenally stressful and emotionally exhausting to Plaintiff and has caused her considerable further harm.

52. As a result of the foregoing misconduct, consisting of, *inter alia*, flagrant violations of the ADA, including unlawful discrimination and retaliation, Plaintiff has suffered substantial damages, including compensatory and punitive damages, lost wages, front pay, back pay, considerable emotional distress, and she is entitled to recover all that is available under the ADA.

### FOR A FIRST CAUSE OF ACTION
### (Disability Discrimination in Violation of the ADA)

53. Plaintiff reavers all preceding and subsequent paragraphs as if set forth fully herein.

54. By acts and practices alleged above, and by other and related acts and practices, Defendants have willfully deprived Plaintiff of equal employment opportunities guaranteed by law by discriminating against her with respect to the terms, conditions and privileges of her employment, including, *inter alia*, the unlawful termination of the Plaintiff on account of her disabilities and by depriving her of employment opportunities; all in violation of the Americans with Disabilities Act, ("ADA"), 42 U.S.C. §12101, *et seq*.

55. The actions and omissions of Defendants were willful, malicious and in bad faith and proximately caused actual and punitive damages to Plaintiff.

### FOR A SECOND CAUSE OF ACTION
### (Retaliation in Violation of the ADA)

56. Plaintiff reavers all preceding and subsequent paragraphs as if set forth fully herein.

57. By acts and practices alleged above, and by other related acts and practices, Defendants have willfully retaliated against Plaintiff by taking adverse and harmful actions against Plaintiff for her lawful and protected reports of harassment and discrimination, all in violation of the Americans with Disabilities Act, ("ADA"), 42 U.S.C. §12101, *et seq*.

58. The actions and omissions of Defendants were willful, malicious and in bad faith and proximately caused actual and punitive damages to Plaintiff.

**WHEREFORE**, Plaintiff respectfully prays that this Court enter judgment against the Defendants, as follows:

a) For all relief available under the ADA, including back pay, front pay, compensatory damages, punitive damages, costs, and attorney's fees; and

b) For such other and further relief as the Court deems proper, just and equitable.

GIBBS & HOLMES

s/A. Riley Holmes, Jr.
Allan R. Holmes (ID#1925)
A. Riley Holmes, Jr. (ID#11115)
171 Church Street, Suite 110
Post Office Box 938
Charleston, S.C.  29402
(803) 722-0033

ATTORNEYS FOR THE PLAINTIFF

Charleston, South Carolina

March 5, 2026